**UNITED STATES of America for the Use and Benefit of WHITAKER'S INC. OF SUMTER, Plaintiff,**

**v.**

**C.B.C. ENTERPRISES, INC., and Reliance Insurance Company, Defendants.**

Civ. A. No. 2:92cv477.

United States District Court, E.D. Virginia, Norfolk Division.

April 30, 1993.

---

William Albert Cox, III, Kellam, Pickrell, Cox & Taylor, Virginia Beach, VA, for plaintiff.

Benjamin Arthur Hubbard, III, Outland, Gray, O'Keefe & Hubbard, Chesapeake, VA, for defendants.

## ORDER AND OPINION

MORGAN, District Judge.

### PROCEDURAL BACKGROUND

On June 24, 1992, Plaintiff Whitaker's Inc. of Sumter ("Whitaker's") filed this action against Defendants C.B.C. Enterprises, Inc.

("C.B.C.") and Reliance Insurance Company ("Reliance"). Plaintiff brought suit pursuant to the Miller Act, 40 U.S.C. § 270b, charging the Defendants in Count I with refusing to tender funds owed to Plaintiff for supplying a portion of a purchase order agreement ("agreement") with C.B.C. The agreement called for Plaintiff to supply C.B.C. with certain kitchen cabinets and vanities required by a contract between C.B.C. and the United States Navy. In addition, in Count II Plaintiff sought to recover lost profit from the Defendants on the remainder of its installment contract with C.B.C.[1]

On August 3, 1992, Defendant, C.B.C., filed a counterclaim against Plaintiff, seeking damages that included the cost of obtaining replacement cabinets and vanities, home and field office overhead, and other consequential damages. The Court conducted a bench trial commencing on April 20, 1993.

## THE PARTIES

1. Whitaker's is a corporation organized under the laws of the State of South Carolina, with its principal place of business in Sumter, South Carolina. Whitaker's is primarily a contract cabinet manufacturer with its main source of business generated by government and municipal contracts, supplying cabinets to military bases and low-cost housing projects, for example.

2. C.B.C. is a corporation organized under the laws of the Commonwealth of Virginia, with its principal place of business in Norfolk, Virginia. C.B.C. is in the business, *inter alia*, of performing work as a general contractor.

3. Reliance is a corporation organized under the laws of Pennsylvania and qualified to do business in the Commonwealth of Virginia on September 28, 1990. Reliance, as a surety, may issue payment bonds on behalf of construction projects as required by 40 U.S.C. § 270a.

---

1. At the close of Plaintiff's case, the Court granted the Defendants' motion to strike Count II of the Plaintiff's complaint that sought damages for overhead and profit. The Court found that the Plaintiff failed to introduce evidence to support any such damages.

## FACTS

On August 27, 1991, Whitaker's contracted with C.B.C. to provide C.B.C. kitchen and vanity cabinets and counter tops. *See* Exh. 1. C.B.C. required the cabinets and counter tops for fulfillment of Government Contract # N62470–88–C–8304 for the renovation for 819 units of base housing at Naval Amphibious Base, Little Creek, Virginia Beach, Virginia. The contract directed that Whitaker's provide the goods F.O.B. job site at Little Creek in consideration of the total sum of $265,000.00.

The agreement stipulated that the cabinets and counter tops comply with "Specification Section 12391," the Navy's requirements for residential kitchen and vanity cabinets. *See* Exh. 2. Section 12391 required compliance with Section 01300 on submittals. *Id.* The submittals section detailed procedures necessary for governmental approval. For example, § 1.2.5 of Section 12391 required the supplier of the cabinets to "[s]ubmit one assembled first article for inspection and approval by the Contracting Officer at the installation site." *Id.*, Section 12391 at 2. The specifications also stipulated the materials and dimensions of the cabinets—the doors called for "[s]olid hardwood stiles and rails, not less than ¾-inch thick with hip-raised hardwood panels." *Id.* at 4.

Pursuant to the specifications and procedures provided in Sections 12391 and 01300, Plaintiff provided C.B.C. with shop drawings and submittals including a sample cabinet on October 18, 1991. *See* Exh. 4. The shop drawings were approved as noted[2] by the Contract Quality Control Representative, Ernest L. Heck, and the project architect on October 25, 1991. *Id.;* Def. Exh. 15. The Plaintiff received the dimensions for the project on November 15, 1991. *See* Exh. 7. Moreover, this transmittal called for the cabinets and counter tops to be shipped in units of fifteen (15) each. However, when the Plaintiff realized it could load an additional

---

2. "Manufacturer Deviations From Plans/Elevations Acceptable." Exh. 4.

four units on the shipping truck, it received dimensions for and constructed four additional units and shipped a total of nineteen (19) units of kitchen cabinets and twenty units of vanities and counter tops. Plaintiff's cabinets were constructed with a flat door. The Plaintiff sent C.B.C. an invoice for $19,935.62 for the nineteen (19) units on December 10, 1991 which arrived at Little Creek on December 11, 1991. *See* Exh. 8.

C.B.C.'s job site project manager, Alvin C. Strickland, notified the Plaintiff on December 12, 1991, that the cabinets and counter tops did not conform to the agreement between the parties. *See* Exh. 9. Specifically, Strickland noted the following "deficiencies": (1) no ANSI certification stickers,[3] (2) no valances, (3) no connecting turnbuckles for counter tops, (4) rough cabinet edges capable of field correction, (5) lack of wood colored putty sticks, and (6) a missing statement of the qualification for the person attaching the ANSI Certificate. *Id.* Strickland did not raise objections to the cabinet doors, materials used, or color in the December 12, 1991 transmittal. Heck directed that the cabinets not be installed until the Plaintiff supplied the missing ANSI stickers. After the Plaintiff delivered non-approved stickers, Heck ordered that the cabinets not be installed. However, based upon assurances from Whitaker's, Strickland proceeded to have fifteen (15) units of cabinets and counter tops installed. The floor (a/k/a/ base) units had to be cut and shaped to be installed over exposed pipes running throughout the base housing.

After the installation of the units had begun, a meeting was held at the job site on December 19, 1991, attended by representatives of the Plaintiff, C.B.C. and the Navy. The Navy representative, Lieutenant Robert Tomiak, indicated that the initial shipment of units did not comply with Specification Sections 12931 and 01300 in that they contained flat doors, not the "hip-raised" doors called for, expressed dissatisfaction with the color, and raised general concerns with the workmanship of the cabinets. *See* Exh. 11. The Plaintiff's President, Edsel V. Whitaker, as-

sured C.B.C. and Lieutenant Tomiak that Whitaker's would correct or replace nonconforming cabinets. On December 23, 1991, C.B.C. informed Plaintiff that it was in receipt of a non-compliance notice from the Navy regarding the nonconforming cabinets. *See* Exh. 13. On December 24, 1991, the Navy provided C.B.C. with a list of specific non-conformities with Plaintiff's cabinets. *See* Exh. 14. When Plaintiff took inadequate steps to provide conforming cabinets or to attempt to "cure" the deficiencies of the installed cabinets, C.B.C. notified Plaintiff on January 16, 1992, that it would terminate the agreement unless Plaintiff responded immediately. *See* Exh. 28. When Plaintiff failed to respond in the manner requested, C.B.C. issued a Notice of Termination on January 21, 1992. *See* Exh. 30.

Following Plaintiff's termination, C.B.C. contracted with Evan's Cabinets Company of Dublin, Georgia, to supply conforming cabinets and counter tops at the cost of $273,728.00. When Plaintiff refused C.B.C.'s request that Plaintiff remove and retrieve its nonconforming cabinets, C.B.C. removed the cabinets, disposed of them and installed Evan's cabinets. C.B.C. refused to pay Plaintiff the $19,935.62 sought in its December 10, 1991 invoice. The Plaintiff never shipped additional cabinets or counter tops following the shipment of the first installment.

The Court makes the following findings of fact:

1. The Plaintiff's cabinets were nonconforming. While there may be some room for ambiguity as to whether the specifications called for a flat door or a raised panel door, the cabinets were clearly nonconforming. As Strickland's December 12, 1991 transmittal indicated, the cabinets lacked the ANSI stickers and were defective in other respects. Evidence received at trial indicated that the Plaintiff's cabinets had splintered and ripped edges, shelves were not flush, joints had gaps, door and hinges were misaligned and the wood was knotted. Moreover, there was no practical way that these nonconforming

---

**3.** These stickers certify that the cabinet has been approved by standards promulgated by the Kitchen Cabinet Manufacturers Association

("KCMA") pursuant to the American National Standard Institute ("ANSI").

cabinets could be "cured" in the field, and that should have been obvious to Whitaker's and C.B.C.

2. While it is clear that a sample cabinet was required on the job site, whether or not the sample had to be installed is not clear. For reasons not fully explained, C.B.C. chose to install fifteen (15) of the nonconforming cabinets, even though both Heck and Lieutenant Tomiak directed C.B.C. not to install them. By choosing to install nonconforming cabinets that obviously could not be cured after installation (though possibly replaced), C.B.C. accepted the shipment of the nineteen (19) units from the Plaintiff.

3. Both parties contributed to the delay of the project's commencement and completion. C.B.C. contributed to the delay (1) by not furnishing the dimensions to the Plaintiff until November 15, 1991, even though the agreement called for the units to be delivered by November 8, 1991, (2) by electing to install all fifteen (15) of the cabinets before any one unit had been approved by the Navy and (3) by thereafter urging the Navy to accept Whitaker's cabinets. Likewise, the Plaintiff contributed to the delay by (1) shipping nonconforming cabinets and (2) promising to cure or replace the nonconforming cabinets and then taking no effective action between the December 19, 1991 meeting and the purchase order termination date of January 21, 1992. The actions of both parties contributed to the delay and the Court finds it inappropriate to undertake an apportionment of the parties' respective contributions to the delay.

4. The Court disagrees with the Plaintiff that C.B.C. was subject to § 8.2–601 and could have rejected the whole, accepted the whole or accepted any commercial units and rejected the rest. Section 8.2–601 specifically points out that it is "[s]ubject to the provisions of this title on breach in installment contracts (§ 8.2–612)...." Va. Code Ann. § 8.2–601. The so-called "perfect tender rule" that governs single delivery contracts is not available in installment contracts. Section 8.2–612(2) only permits a buyer to reject nonconforming goods that "substantially impair" *the value of the installment.* Va.Code Ann. § 8.2–612.

5. "Whenever nonconformity or default with respect to one or more installments substantially impairs the value of the whole contract there is a

## ANALYSIS

### I. *Plaintiff's Complaint*

■ Since the agreement between the Plaintiff and C.B.C. was for the sale of goods between merchants, the contract is subject to the provisions of the Uniform Commercial Code ("UCC"), which has been adopted in Virginia as Title 8.2 of the Code of Virginia. In assessing the Plaintiff's claim for damages, the critical inquiry is whether C.B.C. "accepted" the cabinets within the meaning of the UCC? Even if the Court accepts the Plaintiff's argument that the purchase order created an installment contract, when an installment contract is breached, "[t]he buyer may reject any installment which is nonconforming if the nonconformity substantially impairs the value of that installment and cannot be cured...." Va.Code Ann. § 8.2–612(2) (Michie 1991).[4] Given that the Plaintiff's first installment of cabinets were clearly nonconforming and could not be cured in the field, C.B.C. was entitled to reject all nineteen (19) units. This is true whether the "perfect tender rule" as to single delivery contracts applies or the rules as to installment contracts apply.[5] However, C.B.C. declined to exercise its right to reject the first installment, choosing instead to install fifteen (15) of the units.

The UCC provides that "[a]cceptance of goods occurs when the buyer ... does any act inconsistent with the seller's ownership...." Va.Code Ann. § 8.2–606(1)(c). The Official Comments to this section provide that "any action taken by the buyer,

breach of the whole." Va.Code Ann. § 8.2–612(3) (Michie 1991). The Court need not decide whether Plaintiff's nonconforming first installment "substantially impair[ed]" the value of the whole contract." *Id.* Even if the first installment did not, of itself, result in a breach of the whole contract, the Plaintiff nevertheless breached the whole as it refused to attempt to cure the nonconformities in the first installment, failed to provide replacement units and gave no indication that any forthcoming shipments would be in compliance with the contract specifications. Accordingly, by January 21, 1992, C.B.C. could properly conclude that Plaintiff was in breach of the purchase order agreement, terminate its contract with the Plaintiff and obtain substitute units in the marketplace.

which is inconsistent with his claim that he has rejected the goods, constitutes an acceptance." *Id.* cmt. 4. By taking possession of the cabinets, cutting them to fit over pipes and installing the units, C.B.C. accepted the cabinets within the meaning of the UCC. This chain of events demonstrates activity which was clearly inconsistent with Plaintiff's ownership of the cabinets. *Twin Lakes Mfg. Co., Inc. v. Coffey,* 281 S.E.2d 864, 867, 222 Va. 467, 474 n. 2 (1981) ("Ordinarily, acceptance occurs when the buyer 'does any act inconsistent with the seller's ownership.' Code § 8.2–606(1)(c)."). *See United States v. Crawford,* 443 F.2d 611 (5th Cir.1971) (In Miller Act suit, buyer's installation of nonconforming fuel filter/separator units at naval base constituted "acceptance" under section 2–606(1)(c) of the UCC); *Cervitor Kitchens, Inc. v. Chapman,* 82 Wash.2d 673, 513 P.2d 25 (1973) (Contractor "accepted" kitchen units by installing units containing defects that were readily ascertainable to the buyer).

■ Having installed the fifteen (15) units, C.B.C. was bound to pay for all nineteen (19) units contained in the first shipment: "The buyer must pay at the contract rate for any goods accepted." Va.Code Ann. § 8.2–607(1). Section 8.2–607 further provides that "[a]cceptance of goods by the buyer precludes rejection of the goods accepted and if made with knowledge of a nonconformity cannot be revoked because of it unless the acceptance was on the reasonable assumption that the nonconformity would be seasonable cured...." Va.Code Ann. § 8.2–607(2). As stated *supra,* C.B.C. accepted the cabinets with full knowledge of the deficiencies. Further, it knew, or should have known, that the defects were of such a nature that they could not be "seasonably cured." Hence, the UCC did not grant C.B.C. the option of revoking its purchase order with the Plaintiff as to the initial shipment of nineteen (19) units.

■ Accordingly, C.B.C. is liable to the Plaintiff for its invoice for the first nineteen (19) units. *Chapman,* 82 Wash.2d at 676–77, 513 P.2d at 26–27 (Contractor's installation of nonconforming kitchen units rendered contractor liable to seller for purchase price). C.B.C. was bound by section 8.2–607(1) to tender the full payment to the Plaintiff of its December 10, 1991 invoice.[6] Accordingly, as to Count I of the complaint the Court AWARDS the Plaintiff the sum of $19,935.62 as payment for the nineteen (19) units. For the reasons stated *supra,* the Court finds for the Defendants as to Count II of Plaintiff's complaint. *See supra* n. 1.

## II. Defendant, C.B.C.'s, Counterclaim

Defendant, C.B.C.'s, counterclaim seeks, *inter alia,* to recover the difference between the contract price quoted by the Plaintiff and the contract price quoted by Evan's Cabinets which was eventually paid in full. This claim is also controlled by the terms of the UCC.

■ The UCC states that "where a tender has been accepted ... the buyer must within a reasonable time after he discovers or should discover any breach notify the seller of breach or be barred from any remedy.... The burden is on the buyer to establish any breach with respect to the goods accepted." Va.Code Ann. § 8.2–607(3)(a) & (4). C.B.C. complied with this section by immediately notifying the Plaintiff of the deficiencies in the nineteen (19) units and by demonstrating, through the testimony of its expert witness, Mr. Paul Rumbaugh, and others, the nonconformity of the cabinets with ANSI/KCMA standards. Even though C.B.C. accepted the Plaintiff's first installment and became bound to pay for those units, Plaintiff nevertheless breached the whole contract by refusing to attempt to cure the nonconformities and by

---

6. Moreover, assuming *arguendo* that C.B.C. rightfully rejected the Plaintiff's nonconforming cabinets, C.B.C. was not permitted to remove and discard the units, let alone recover damages for the expenses it incurred in so doing. The UCC provides that "if the seller gives no instructions within a reasonable time after notification of rejection, the buyer may store the goods for the seller's account or reship them to him or resell them for the seller's account with reim-

bursement as provided in the proceeding section." Va.Code Ann. § 8.2–604. When the Plaintiff refused to retrieve the cabinets, C.B.C. failed to take any of these steps. While this list is illustrative and not exhaustive, the UCC is clear that the buyer has a duty to salvage rightfully rejected goods for the seller's benefit. Destroying rightfully rejected nonconforming goods is not included among the buyer's options.

failing to provide replacement units. Moreover, Plaintiff gave C.B.C. no indication that any subsequent shipments would meet the contract specifications. Accordingly, C.B.C. rightfully concluded that Plaintiff's nonconforming units were in breach of the purchase order agreement pursuant to section 8.2–607(3)(a). Thus, given that the units failed to meet the ANSI/KCMA standards for several reasons and faced with a notice of non-compliance from the Navy, C.B.C. took the only reasonable action it could have taken and obtained replacement units in the marketplace.

 Section 8.2–714 provides for "Buyer's damages for breach in regard to accepted goods": "Where the buyer has accepted goods and given notification (subsection (3) of § 8.2–607) he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable." Va.Code Ann. § 8.2–714(1). As discussed *supra*, after accepting nonconforming goods that Plaintiff refused to cure or replace, C.B.C. was forced to obtain substitute units from Evan's Cabinets. Accordingly, the Court believes that the proper measure of C.B.C.'s damages under section 8.2–714(1) is the cover price of procuring substitute goods, not unlike the remedy provided in section 8.2–712 to buyers who rightfully reject or justifiably revoke acceptance of nonconforming goods. *Chapman*, 82 Wash.2d at 678–79, 513 P.2d at 28 (Contractor who accepted nonconforming goods could nevertheless recover damages for breach of contract by seller). Therefore, the appropriate measure of damages is the difference between the $265,000.00 contract price quoted by the Plaintiff and the $273,728.00 contract price quoted by Evan's Cabinets. *See* Def. Exh. 9.

Accordingly, pursuant to its counterclaim, the Court AWARDS the Defendant, C.B.C., the difference between the contract price and the "cover" price in the sum of $8,728.00.[7]

## CONCLUSION

In conclusion, the Court FINDS the Defendants liable to Plaintiff pursuant to Count I of the complaint in the sum of $19,935.62 and FINDS the Plaintiff liable to the Defendant, C.B.C., in the sum of $8,728.00 pursuant to the counterclaim. The Court does not award costs or attorneys' fees to any party because it finds all parties entitled to prevail in part.

It is so ORDERED.

---

7. The Defendants sought to recover $9,120.76 as the difference between the original agreement and the cover price. However, C.B.C.'s representative could not account for the difference between this amount and the $8,728.00 as reflected in the Purchase Order Agreement between C.B.C. and Evan's Cabinets. *See* Def. Exh. 9. Though C.B.C. adequately documented the expenses incurred in obtaining conforming units, the Court does not award Defendants delay damages because both parties contributed to delaying the contract's completion. In addition, Defendants may not recover consultant's fees or photographer's expenses because the testing authority under the agreement was the Navy, not an outside consultant, and because of C.B.C.'s responsibility for the delay and its liability for payment of Plaintiff's invoice. For the same reasons, Defendants may not recover their attorneys' fees.