# United States Court of Appeals for the Federal Circuit

---

**THE PORTLAND MINT,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2022-2154

---

Appeal from the United States Court of Federal Claims in No. 1:20-cv-00518-MBH, Senior Judge Marian Blank Horn.

---

Decided: May 30, 2024

---

LEE VARTAN, Chiesa Shahinian & Giantomasi PC, Roseland, NJ, argued for plaintiff-appellant. Also represented by JONATHAN DAVID SHAFFER, Haynes and Boone, LLP, Tysons Corner, VA.

ALISON VICKS, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by BRIAN M. BOYNTON, DEBORAH ANN BYNUM, PATRICIA M. MCCARTHY.

---

Before DYK, MAYER, and TARANTO, *Circuit Judges.*

DYK, *Circuit Judge.*

The Portland Mint ("Portland Mint") delivered truckloads of coins to a foundry designated by the United States Mint ("U.S. Mint") pursuant to a regulation, 31 C.F.R. § 100.11, that provided for redemption of mutilated coins. The coins were melted down and used to make new coins. The U.S. Mint refused to pay for the shipment on the ground that "a very high percentage of coins submitted" were counterfeit. J.A. 288. Portland Mint, alleging that the coins were genuine, brought five claims against the United States in the Court of Federal Claims ("Claims Court") for (1) a violation of 31 C.F.R. § 100.11, (2) breach of an implied contract, (3) breach of the implied duty of good faith and fair dealing, (4) a Fifth Amendment takings claim, and (5) an Equal Access to Justice Act claim for fees.

The Claims Court dismissed all five claims, concluding that it lacked jurisdiction for claims one and two, and that all five claims failed to state a claim upon which relief could be granted. We find that the Claims Court erred in dismissing claim two for lack of jurisdiction and failure to state a claim. In light of our reversal as to claim two, we affirm the dismissal of the remaining three merits claims. We do not reach claim five concerning attorneys' fees. We affirm in part and reverse and remand in part for further proceedings.

BACKGROUND

Beginning in 1911, the U.S. Mint established a Mutilated Coin Redemption Program ("Redemption Program") where individuals or businesses could submit bent or

partial coins to the U.S. Mint in exchange for payment.[1] The U.S. Mint would then use these mutilated coins to make new coins. While the Redemption Program has recently been suspended, it was in effect during the period in question here. The regulation governing the Redemption Program provided that individuals or businesses that participated in the Redemption Program "may be subject to a certification process[,] . . . may be required to provide documentation for how the participant came into custody of the bent or partial coins," and "[t]he United States Mint reserves the right to test samples from any submission to authenticate the material." 31 C.F.R. § 100.11(c)(1), (3), (4).

The Redemption Program regulation also provided that the U.S. Mint would not redeem submitted coins in certain circumstances.

> No redemption will be made when:
>
> > (i) A submission, or any portion of a submission, demonstrates a pattern of intentional mutilation or an attempt to defraud the United States;

---

[1]     The Redemption Program regulation only covers current bent or partial coins. "Uncurrent coins are whole U.S. coins which are merely worn or reduced in weight by natural abrasion yet are readily and clearly recognizable as to genuineness and denomination and which are machine countable." 31 C.F.R. § 100.10(a). Uncurrent coins cannot be redeemed under the Redemption Program regulation and can only be redeemed through "a bank or other financial institution that will accept them, or with a depository institution that has established a direct customer relationship with a Federal Reserve Bank." *Id.* § 100.10(b).

(ii) A submission appears to be part of, or intended to further, any criminal activity;

(iii) A submission contains a material misrepresentation of facts;

(iv) Material presented is not identifiable as United States coins. In such instances, the participant will be notified to retrieve the entire submission, at the participant's sole expense, within 30 days. If the submission is not retrieved in a timely manner, the entire submission will be treated as voluntarily abandoned property, pursuant to 41 C.F.R. [§] 102-41.80, and will be retained or disposed of by the United States Mint;

(v) A submission contains any contaminant that could render the coins unsuitable for coinage metal. In such instances, the participant will be notified to retrieve the entire submission, at the participant's sole expense, within 30 days. If the submission is not retrieved in a timely manner, the entire submission will be treated as voluntarily abandoned property, pursuant to 41 C.F.R. [§] 102-41.80, and will be retained or disposed of by the United States Mint; or

(vi) A submission contains more than a nominal amount of uncurrent coins. In such instances, the participant may be notified to retrieve the entire submission, at the participant's sole expense, within 30 days. If the submission is not retrieved in a timely manner, the entire submission will be treated as voluntarily abandoned property, pursuant to 41 C.F.R. [§] 102-

> 41.80, and will be retained or disposed of by
> the United States Mint.

*Id.* § 100.11(c)(6).  Subsections (i) to (iii) have been interpreted by the U.S. Mint to authorize the U.S. Mint to reject counterfeit coins, or a shipment that consists in part of counterfeit coins.

The following factual recitation is taken from Portland Mint's second amended complaint unless otherwise indicated.  Portland Mint first participated in the Redemption Program in 2012, and from the period of 2012 to 2015 was paid approximately $229,632 for about 21 shipments of coins.  Three of Portland Mint's coin shipments were detained at the ports by the Department of Homeland Security ("DHS").  Portland Mint filed a civil action to regain possession of its coin shipments, and during discovery DHS produced a laboratory report analyzing Portland Mint's coins, which found "[t]he samples have a broad range of date mint marks and their weights and alloy compositions are indistinguishable from standard currency."  J.A. 437.  DHS ultimately returned the coins to Portland Mint.  In 2015, the U.S. Mint suspended the Redemption Program, allegedly due to suspected submissions of counterfeit coins by other parties.

In January 2018, the U.S. Mint resumed the Redemption Program.  Portland Mint submitted an application to participate in the Redemption Program, and it was approved by the U.S. Mint.  Anthony Holmes, Jr., a supervisor at the U.S. Mint, coordinated with Portland Mint for its first delivery.  Mr. Holmes designated the delivery to be made at the Olin Brass foundry in Illinois.  On August 1 and 2, 2018, Portland Mint delivered approximately 427,000 pounds of coins, which Portland Mint alleged included the coins previously detained by DHS.  The U.S. Mint retained about 35 pounds of the submission as a sample for testing.  The U.S. Mint proceeded to melt the remainder of the submission.  The resulting product was

used by the U.S. Mint to make new coins. Portland Mint was told that payment for submissions generally issued 4–6 weeks after delivery.

In the following months, Portland Mint inquired about the status of its payment, and the U.S. Mint responded that it was "still evaluating the coins for final receipts" and "[p]reliminary testing of the materials submitted by the Portland Mint has identified technical anomalies that have required additional, detailed testing to ensure they are appropriate for redemption." J.A. 448.

On April 28, 2020, Portland Mint filed a complaint in the Claims Court and eventually filed a second amended complaint alleging five claims seeking primarily to recover the value of the submitted coins: (1) a violation of 31 C.F.R. § 100.11 (the Redemption Program regulation), (2) breach of an implied contract defined by the Redemption Program regulation, (3) breach of the implied duty of good faith and fair dealing, (4) a Fifth Amendment takings claim, and (5) an Equal Access to Justice Act claim for attorneys' fees.

On December 30, 2020, while the Claims Court case was pending, the U.S. Mint sent a letter to the Portland Mint stating that the U.S. Mint had tested a representative sample of the coins submitted and

> the testing sufficiently supports a conclusion that the coins [Portland Mint] submitted in August 2018 were counterfeit. Based on this finding, and pursuant to 31 C.F.R. § 100.11(c)(6)(i)–(iii) and 31 C.F.R. § 100.11(c)(7), the [U.S.] Mint denies redemption of [] Portland Mint's material submitted to the . . . Redemption Program in August 2018.

J.A. 288. The U.S. Mint appears to agree that the shipment was a mixture of genuine and counterfeit coins.

The U.S. Mint moved to dismiss Portland Mint's second amended complaint for lack of jurisdiction and failure to state a claim. The Claims Court granted the motion to

dismiss in its entirety, finding for claims one and two that it lacked jurisdiction and Portland Mint failed to state a claim upon which relief could be granted, and for claims three, four and five that Portland Mint failed to state a claim. Portland Mint appeals.

We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).[2]

---

[2] The statement in the Redemption Program regulation that "[t]he Director of the United States Mint, or designee, shall have final authority with respect to all aspects of redemptions of bent or partial coin submissions," 31 C.F.R. § 100.11(c)(7), does not deprive this Court or the Claims Court of jurisdiction. "[T]he Tucker Act broadly waives the government's sovereign immunity for claims asserting breach of contract," and "[f]or a statute to reinstate the government's sovereign immunity, Congress must manifest an 'unambiguous intention to withdraw the Tucker Act remedy.'" *Cardiosom, L.L.C. v. United States*, 656 F.3d 1322, 1329 (Fed. Cir. 2011) (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1019 (1984)). "When determining whether a statute precludes judicial review, we apply a '"strong presumption" in favor of judicial review.'" *Alarm.com Inc. v. Hirshfeld*, 26 F.4th 1348, 1354 (Fed. Cir. 2022) (quoting *Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 273 (2016)). "[T]he presumption of reviewability may be overcome only by 'clear and convincing indications, drawn from specific language, specific legislative history, and inferences of intent drawn from the statutory scheme as a whole, that Congress intended to bar review.'" *Id.* (quoting *Cuozzo*, 579 U.S. at 273). Here, there was no such Congressional intent expressed in the statute. *See* 31 U.S.C. §§ 321, 5120. Instead, it is only the agency's regulation which grants the Director of the Mint final authority. This is insufficient to deprive the Claims Court of jurisdiction.

## DISCUSSION

### I

We first consider Portland Mint's claim two, which alleges that its submission of coins pursuant to the Redemption Program regulation created an implied-in-fact contract between Portland Mint and the U.S. Mint, the terms of which could be found in the regulation. The Claims Court concluded that the contract alleged by Portland Mint was an implied-in-law contract and that "[t]he [Claims] Court . . . lacks jurisdiction over contracts implied in law." *Portland Mint v. United States*, 160 Fed. Cl. 642, 667 (2022) (quoting *Int'l Data Prods. Corp. v. United States*, 492 F.3d 1317, 1325 (Fed. Cir. 2007)). Jurisdiction is an issue of law that we review de novo. *Case, Inc. v. United States*, 88 F.3d 1004, 1008 (Fed. Cir. 1996).

"Generally speaking, implied-in-law contracts 'impose duties that are deemed to arise by operation of law' in order to prevent an injustice, whereas implied-in-fact contracts are 'founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in light of the surrounding circumstances, their tacit understanding.'" *Lumbermens Mut. Cas. Co. v. United States*, 654 F.3d 1305, 1316 (Fed. Cir. 2011) (quoting *City of Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed. Cir. 1998)).

The Claims Court explained that Portland Mint alleged in its complaint that the "essential terms of the implied contract were found in the [U.S.] Mint's own regulations," *Portland Mint*, 160 Fed. Cl. at 667 (quoting J.A. 455), and thus "if duties existed between the parties, those duties existed by operation of the regulation at 31 C.F.R. § 100.11, or by operation of statute, not because of any contractual agreement, negotiated or otherwise." *Portland Mint*, 160 Fed. Cl. at 668. The Claims Court concluded that the contract was implied-in-law.

Decisions of our predecessor court (binding on us) are to the contrary. In *Radium Mines, Inc. v. United States*, 153 F. Supp. 403, 404 (Ct. Cl. 1957), a regulation was adopted in order "[t]o stimulate domestic production of uranium." The regulation set forth conditions (weight and concentration minimums) to be met for the government to accept a shipment of uranium, that a representative sample of the submission would be tested, and if the requirements were met, the government would pay certain minimum prices. *Id.* at 404–05.

The government argued that submission of the uranium pursuant to the regulation did not create a contract and instead was "a mere invitation to the industry to make offers to the [g]overnment, which the [g]overnment could then accept or reject as it saw fit." *Id.* at 405. Our predecessor court disagreed, reasoning that the regulation's "purpose was to induce persons to find and mine uranium" and "[i]t could surely not be urged that one who had complied in every respect with the terms of the [regulation] could have been told by the [g]overnment that it would pay only half the 'Guaranteed Minimum Price,' nor could he be told that the [g]overnment would not purchase his uranium at all." *Id.* at 406. Thus, the regulation evidenced "the [g]overnment's offer to purchase," which could form a "contract . . . by offer and acceptance." *Id.*; *see also Griffin v. United States*, 215 Ct. Cl. 710, 714 (1978) (holding that "the Secretary had become bound by an implied contract" based on "the statute, which in effect authorized purchase of suggestions from service members" and "[h]ere [the suggestion] was accepted and acted on"); *New York Airways, Inc. v. United States*, 369 F.2d 743, 751 (Ct. Cl. 1966) (holding that "[t]he actions of the parties support the existence of a contract . . . implied in fact" because "[t]he Board's rate order was, in substance, an offer by the [g]overnment to pay the plaintiffs a stipulated compensation for the transportation of mail, and the actual transportation of the mail was the plaintiffs' acceptance of that offer").

Just as an implied-in-fact contract was found in *Radium Mines*, Portland Mint here has alleged an implied-in-fact contract. Congress has mandated that "[t]he Secretary of the Treasury shall melt obsolete and worn United States coins withdrawn from circulation," 31 U.S.C. § 5120(a)(1), and the Treasury Department established the Redemption Program in response to this mandate. Just as in *Radium Mines*, the regulation here was meant to induce persons to submit coins. The Redemption Program regulation also set forth conditions. The regulation provided for redemption by the U.S. Mint of "[l]awfully held bent or partial coins," "which are readily and clearly identifiable as to genuineness and denomination." 31 C.F.R. § 100.11(a)–(b). If the coins were redeemed by the U.S. Mint, the U.S. Mint would pay set prices based on the type and number of coins. *Id.* § 100.11(d). The regulation also contained language that "[a]ny submission under this subpart shall be deemed an acceptance of all provisions of this subpart," *id.* § 100.11(a), which contemplated that redemption of coins would create a contract.

The regulation here closely mirrors the regulation in *Radium Mines*. 153 F. Supp. at 404–05. The regulation acted as an offer, and if a party submitted qualifying coins to the U.S. Mint, it was an acceptance, and an implied-in-fact contract was created. The Claims Court erred in holding that the regulation here could not create an implied-in-fact contract. The Claims Court had jurisdiction over claim two.

II

The Claims Court also dismissed Portland Mint's implied contract claim for failure to state a claim. We review a grant of a motion to dismiss for failure to state a claim de novo. *Inter-Tribal Council of Ariz., Inc. v. United States*, 956 F.3d 1328, 1338 (Fed. Cir. 2020).

A

Portland Mint contended that the U.S. Mint "breached its contractual duties by accepting the coins for redemption and melting them, but failing and refusing to pay the Portland Mint." J.A. 456. The primary issue here is the meaning of the term "redeem" as used in the Redemption Program regulation and hence in the contract. Portland Mint argued that the definition of "redemption" was "[t]he act or an instance of reclaiming or regaining possession by paying a specific price." J.A. 526 (alteration in original) (citing *Redemption*, BLACK'S LAW DICTIONARY (11th ed. 2019)). Portland Mint therefore contended that the U.S. Mint had redeemed its coins under the regulation when the U.S. Mint took possession of the coins. However, on its face, the mere taking of possession of the coins cannot be a redemption since the contract contemplates that the coins may be tested to determine if they are genuine before they are redeemed and that they will not be redeemed if they are properly rejected.[3] Interpreting the contract formed under the regulation here requires that we address four subsidiary questions.

First, is the U.S. Mint obligated to pay for counterfeit coins? The answer is clearly no, even if the coins were used to make new coinage. If the coins are counterfeit, the U.S. Mint is correct that it need not redeem or pay for them, even if used, because the coins would be forfeited to the U.S. Mint.[4] The forfeiture statute provides that "[a]ll

---

[3]    The regulation itself is titled "Request for examination of bent or partial coin for <u>possible redemption</u>," showing that simply submitting coins to the U.S. Mint does not amount to redemption. 31 C.F.R. § 100.11 (emphasis added).

[4]    "Federal regulations which are based upon a grant of statutory authority 'have the force and effect of law, and,

counterfeits of any coins . . . of the United States . . . shall be forfeited to the United States." 18 U.S.C. § 492. "Items that are considered 'contraband' or 'counterfeit' under Section 492 are deemed illegal *per se* and automatically forfeited without having to satisfy the otherwise applicable forfeiture procedures." *United States v. Von Nothaus*, No. 5:09CR27-RLV, 2014 WL 6750312, at *6 (W.D.N.C. Dec. 1, 2014); *see also Boggs v. Merletti*, 987 F. Supp. 1, 10 (D.D.C. 1997). Thus, any counterfeit coins are forfeited, and the U.S. Mint need not redeem or pay for them under the contract.

The second interpretive question is whether genuine coins can be forfeited if mixed with counterfeit coins. We think that the answer to this question is no. Section 492 did not provide for forfeiture of genuine coins, and some courts have held that under the forfeiture statute, when there is a mixture of genuine and counterfeit coins, the government cannot treat all the coins as forfeited and must return the genuine coins, that is, separate out the genuine coins. *See, e.g.*, *Von Nothaus*, 2014 WL 6750312, at *8. The U.S. Mint urges that under the regulations "submissions will [not] be returned if redemption is denied due to any of the reasons in 31 C.F.R. § 100.11(c)(6)(i)–(iii)." Appellee Br. 33. This argument is based on a comparison between sections (i)–(iii), which are silent on whether a submission will be returned (and which are applicable here), and

---

if they are applicable, they must be deemed terms of the contract even if not specifically set out therein, knowledge of which is charged to the contractor.'" *Gen. Eng'g & Mach. Works v. O'Keefe*, 991 F.2d 775, 780 (Fed. Cir. 1993) (quoting *De Matteo Const. Co. v. United States*, 600 F.2d 1384, 1391 (Ct. Cl. 1979)). Here, the forfeiture statute likewise has the force and effect of law and section 492 covers counterfeit coins and is applicable to the contract. The contract is subject to the forfeiture statute.

sections (iv)–(vi), which are inapplicable here and provide that submissions denied for those reasons will be returned.[5] But the regulation did not provide for forfeiture of genuine coins mixed with counterfeit coins. Without deciding the extent of the government's obligation to separate genuine from counterfeit coins or the extent of its obligation to return genuine coins, we conclude that there is no authority for the government to forfeit genuine coins.

The third question is whether the government can refuse to redeem genuine coins mixed with counterfeit coins. The regulation here suggested that a mixture of counterfeit coins and genuine coins need not be redeemed. The Redemption Program regulation provided six instances when "[n]o redemption will be made." 31 C.F.R. § 100.11(c)(6)(i)–(vi). The regulation provided that an entire lot of coins could be rejected if "[a] submission, or any portion of a submission, demonstrates a pattern of intentional mutilation or an attempt to defraud the United States." *Id.* § 100.11(c)(6)(i) (emphasis added). The submission of counterfeit coins may fall under this provision, but whether it does or not, we think that the regulation did not obligate the government to accept a mixture of genuine and counterfeit coins.

---

[5]   The U.S. Mint's Standard Operating Procedure document states that for "mutilated coin lots that are not accepted for redemption, the Analyst prepares the appropriate communication" to the participant informing the participant of "1. Why the application, mutilated coin shipment, or appeal was deficient or rejected. 2. Directions on shipping the mutilated coin back to them at their expense (if the cause for rejection is that the Participant submitted mutilated coin that was rejected)." J.A. 281 § 6.8.1. We need not decide whether the Standard Operating Procedures are part of the contract.

The fourth question is whether the U.S. Mint is obligated to pay for genuine coins that are in fact used to make new coinage if submitted together with counterfeit coins. We think the answer is yes.

Even if we were to agree with the government that genuine coins in a mixture need not be separated by the government from counterfeit coins and returned, that does not answer the question whether the genuine coins can be used without payment. According to Portland Mint, the melted coins were used to manufacture new coins, and the U.S. Mint appears to agree. The meaning of redeem, generally, is to buy back or repurchase.[6] *Redeem*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/redeem (last visited May 6, 2024). The general rule is that when a contract imposes a requirement for acceptance (redemption) — here genuine coins not mixed with counterfeit coins — and provides for testing, acceptance of the non-complying shipment by the buyer nonetheless creates liability. And acceptance creates an obligation to pay for

---

[6] The Claims Court found that the meaning of redemption under the regulation "provides for the testing and examination of submitted coins," J.A. 24, and because Portland Mint's proposed definition of "redemption" did not include testing, Portland Mint "indeed appears to challenge the statutory, regulatory, and administrative processes established for the Redemption Program for testing," J.A. 25. This was error.

The fact that the Claims Court had to interpret the meaning of "redemption" in the regulation does not convert Portland Mint's claim one or claim two into an APA claim. The Claims Court can resolve issues, including interpreting a government regulation. *See, e.g.*, *Radium Mines*, 153 F. Supp. at 405–06.

the non-complying shipment. The Uniform Commercial Code ("UCC"), which is relevant to government contract law,[7] provides that:

> Acceptance of goods occurs when the buyer (a) after a reasonable opportunity to inspect the goods signifies to the seller . . . that [the buyer] will take or retain them in spite of their non-conformity; or (b) fails to make an effective rejection [], but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or (c) does any act inconsistent with the seller's ownership . . . .

U.C.C. § 2-606 (Am. L. Inst. & Nat'l Comm'n 2023); *see also* Restatement (Second) of Contracts § 246(a)–(b) (Am. L. Inst. 1981); Restatement (First) of Contracts § 298 (Am. L. Inst. 1932) (illustrating that if "A contracts to sell and B to buy for $1000 two saddle horses, to be sound and gentle" and "A furnishes two horses, one of which is vicious," then if B "accepts them" but "retained the horses an unreasonable time after discovering their character, he would have been under a duty to pay the agreed price").

This is illustrated in the Supreme Court case of *Cincinnati Siemens-Lungren Gas Illuminating Co. v. W. Siemens-Lungren Co.*, 152 U.S. 200 (1894). That case involved a contract to purchase lamps. *Id.* at 201. The lamps were delivered by the seller but the buyer contended that the "construction [of the lamps] was defective." *Id.* at 209. However, the buyer did not "tender[] them back to [the seller], or even [] ma[ke] any complaint of them for many

---

[7]    "[T]he UCC 'provides useful guidance in applying general contract principles.'" *Pac. Gas & Elec. Co. v. United States*, 838 F.3d 1341, 1351 (Fed. Cir. 2016) (quoting *Hughes Commc'ns Galaxy, Inc. v. United States*, 271 F.3d 1060, 1066 (Fed. Cir. 2001)).

months after their receipt." *Id.* at 210. The Supreme Court held that the buyer therefore still had to pay for the lamps and could only recover damages for "the difference between the contract price and the actual value of the thing delivered." *Id.* In other words, a buyer's keeping and using the good is an act inconsistent with the seller's ownership and therefore counts as acceptance.

Similarly, in *La Miller v. St. Claire Packing Co.*, 99 Cal. App. 2d 518, 521 (1950), the court held that the buyer must pay for tomatoes because it accepted the tomatoes by reason of "conversion of such tomatoes in its canning processes." This was true even though the buyer alleged that the tomatoes were subject to rejection as they were smaller than the contract called for. *Id.* at 520; *see also Ran-Paige Co. v. United States*, 35 Fed. Cl. 117, 119, 123 (1996) (holding that although the buyer notified the seller that the goods were not in compliance with the contract, if "the buyer used the nonconforming goods, the buyer would only be entitled to the difference in the value of the goods warranted and the value of the goods provided"); *U.S. for Use & Benefit of Whitaker's Inc. of Sumter v. C.B.C. Enters., Inc.*, 820 F. Supp. 242, 246–47 (E.D. Va. 1993) (holding that "the [seller's] first installment of cabinets were clearly nonconforming and could not be cured in the field" and thus "[the buyer] was entitled to reject all nineteen (19) units" but "[b]y taking possession of the cabinets, cutting them to fit over pipes and installing the units, [the buyer] accepted the cabinets within the meaning of the UCC" and could not reject them).

In summary, when the U.S. Mint retains, melts, and uses genuine coins, then the regulation is best read as the U.S. Mint having redeemed those coins, and thus it is required to pay for those genuine coins in accordance with the contract.

Portland Mint alleged that it submitted genuine coins to the U.S. Mint and because the coins were melted and

used to make new coins, Portland Mint alleged that it is entitled to payment per 31 C.F.R. § 100.11(d). This is sufficient to state a claim (subject to the authority issue discussed below). This does not mean, of course, that Portland Mint is necessarily entitled to recovery. The U.S. Mint argued that its testing found that "a very high percentage of coins submitted were actually made by a manufacturer other than the United States Mint." J.A. 288. Portland Mint alleged that at least the vast majority of the coins were genuine.[8] Whether some portion of the coins were counterfeit is a relevant fact issue to be determined on remand. There is a genuine dispute of material fact as to which Portland Mint is entitled to discovery. To the extent that the coins are genuine, and absent a showing by the government that Portland Mint was attempting to defraud the United States,[9] or some other defense, Portland Mint must be paid for the genuine coins at prices set out in the regulation, subject to one other issue that we now discuss.

B

The Claims Court also dismissed Portland Mint's contract claim because Portland Mint failed to allege that Mr. Holmes, who accepted the coins, had the necessary authority. "When the United States is a party [to an implied-in-fact contract] . . . [t]he government representative whose

---

[8]    In its second amended complaint, Portland Mint contended that "[a]mong those coins [submitted to the U.S. Mint] were the coins that DHS had previously tested and concluded were genuine. The remainder of the shipment likewise contained genuine, mutilated U.S. coins." J.A. 438.

[9]    The government has not so far alleged that Portland Mint's submission constituted an effort to defraud the United States. We have no occasion here to decide how such a showing would affect Portland Mint's right to recovery.

conduct is relied upon must have actual authority to bind the government in contract." *City of Cincinnati*, 153 F.3d at 1377.

The Claims Court found that Portland Mint's allegations that Mr. Holmes had actual authority "f[e]ll well short" because "Mr. Holmes' duties of supervising [Portland Mint's] participation in the Redemption Program and relaying information did not require that Mr. Holmes possess contracting authority." *Portland Mint*, 160 Fed. Cl. at 670. This was error.

At the motion to dismiss stage, the court is "obligated to assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor." *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995). In *Sommers Oil Co. v. United States*, the appellant claimed to have entered into a contract with "duly authorized agents of the . . . Internal Revenue Service." 241 F.3d 1375, 1379 (Fed. Cir. 2001). While we noted that "the complaint [wa]s not a model of pleading," we nonetheless held that "reading the complaint liberally and indulging all reasonable inferences from the allegations, as we [were] required to do, we conclude[d] that the complaint allege[d] authorization sufficiently to withstand a motion to dismiss." *Id.* "It was sufficient for the complaint to allege that the government's promise was authorized by a person having legal authority to do so." *Id.* at 1380.

In its second amended complaint, Portland Mint alleged that "[a]s demonstrated by the communications and actions of Anthony Holmes, Jr. and other Mint employees, arranging and <u>contracting</u> for the delivery of mutilated coins was <u>an integral part</u> of Mr. Holmes's duties as a supervisor employed by the Mint." J.A. 455 (emphases added). Our cases have held that such an allegation is sufficient to survive a motion to dismiss. "An employee of the [g]overnment has implied actual authority to enter an agreement only when that authority is an 'integral part of

the duties assigned to [the] government employee.'" *Liberty Ammunition, Inc. v. United States*, 835 F.3d 1388, 1402 (Fed. Cir. 2016) (alteration in original) (quoting *H. Landau & Co. v. United States*, 886 F.2d 322, 324 (Fed. Cir. 1989)). "Authority is integral 'when the government employee could not perform his or her assigned tasks without such authority.'" *Id.* (quoting *Flexfab, LLC v. United States*, 62 Fed. Cl. 139, 148 (2004), *aff'd*, 424 F.3d 1254 (Fed. Cir. 2005)).

Reading the complaint liberally and taking all reasonable inferences in favor of Portland Mint, its allegation that an integral part of Mr. Holmes' duties at the U.S. Mint was to enter into contracts amounts to a claim that Mr. Holmes had legal authority to enter into a contract on behalf of the U.S. Mint. Thus, Portland Mint's claim is sufficient to survive a motion to dismiss.

In conclusion, the Claims Court erred in dismissing Portland Mint's implied contract claim for failure to state a claim.

## III

In the light of our holding, Portland Mint's other claims were properly dismissed. Claim one for violation of the regulation was properly dismissed because where the regulation is designed to create a contract, the rights of a claimant under the regulation are defined by the terms of the contract, thus precluding recovery under the regulation. As to claim three for breach of the implied duty of good faith and fair dealing, where, as here, the breach of contract claim and the breach of the implied covenant of good faith and fair dealing claim are based on the same facts, the latter claim should be dismissed as redundant. *See BGT Holdings LLC v. United* States, 984 F.3d 1003, 1016 (Fed. Cir. 2020) ("[T]he contract itself provides other avenues of relief for [the plaintiff] that preempt the need to invoke the doctrine of good faith and fair dealing."); *Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019) ("[T]he

implied duty of good faith and fair dealing cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions." (quoting *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 831 (Fed. Cir. 2010))).  The Fifth Amendment takings claim is also properly dismissed because "when the government itself breaches a contract, a party must seek compensation from the government in contract rather than under a takings claim." *Piszel v. United States*, 833 F.3d 1366, 1376 (Fed. Cir. 2016).  Finally, since we are remanding this case for further proceedings, we need not address claim five because there is currently no prevailing party in the Claims Court.

## CONCLUSION

We reverse the Claims Court's dismissal of Portland Mint's implied contract claim and remand for further proceedings consistent with this opinion.  We affirm the dismissal of the three remaining merits claims.

### AFFIRMED IN PART, REVERSED AND REMANDED IN PART

## COSTS

Costs to appellant.